[Civ. No. 1585.    Third Appellate District.—November 17, 1916.]

## T. A. PIPER, Appellant, v. J. M. KELLERMAN, Respondent.

SPECIFIC PERFORMANCE—CONTRACT FOR INTEREST IN LEASE—SUBSEQUENT CONTRACT GIVING OPTION TO PURCHASE—INTENT TO CANCEL FIRST CONTRACT—PAROL EVIDENCE INADMISSIBLE.—In an action to enforce a written contract for the assignment of an undivided one-half interest in a lease of certain real property, it is reversible error to permit the defendant, over objection, to introduce parol evidence that a written contract subsequently executed by the same parties, wherein the defendant was given an option to purchase such interest under certain conditions, was intended to cancel and extinguish the first contract, where the second contract made no reference to the first contract in any way and did not contain any terms inconsistent therewith, or deal with all the subjects embraced in the first contract; the effect of cancellation, under such circumstances, in view of the fact that the plaintiff acquired his interest in the lease under the first contract, would render the second contract inoperative for want of a subject matter.

ID.—PAROL EVIDENCE—WHEN ADMISSIBLE.—In order to let in evidence of a collateral agreement between the parties, such agreement must be consistent with the terms of the writing; and the evidence must not tend to vary or contradict the terms of the written instrument or to defeat its operation.

APPEAL from a judgment of the Superior Court of Santa Clara County, and from an order denying a new trial. John E. Richards, and W. A. Beasley, Judges.

The facts are stated in the opinion of the court.

Randolph V. Whiting, and C. W. Davison, for Appellant.

N. E. Wretman, and B. A. Herrington, for Respondent.

BURNETT, J.—The action was brought to enforce a certain contract made between plaintiff and defendant on April 22, 1912. The prayer was for a judgment ordering the defendant to execute to plaintiff an undivided one-half interest in a certain lease from the T. A. P. Oil Company and for one thousand two hundred and fifty dollars, in money, together with general relief. An answer and counterclaim were

filed, whereby defendant asked judgment for $1,187.85 and interest, and for a restraining order enjoining plaintiff from prosecuting certain actions against defendant. The counter-claim was upon an assigned account of one N. E. Wretman. At the time of the making of said contract of April 22d, defendant was the owner of a certain lease from the T. A. P. Oil Company, a corporation, and a contract with the Suburban Oil Company, a corporation, whereby respondent was to take a lease on certain property theretofore leased to said company. At the same time appellant was the owner of certain leases upon properties situated near those covered by said lease and contract of respondent. For the purpose of combining their respective interests, appellant and respondent entered into said contract of April 22, 1912, whereby the former agreed to cause to be assigned to the latter an undivided one-half interest in his said leases, and respondent made a similar agreement in favor of appellant as to said lease from the T. A. P. Oil Company, and agreed also that any profits or benefits which he might derive from the contract between himself and said Suburban Oil Company should be equally divided between appellant and respondent. The contract further provided that respondent should pay all rents due, or to become due, on said leases theretofore owned by appellant, and that any other property leased by Piper in the neighborhood of the other lands should be held and operated for the benefit of both; furthermore, that respondent should pay to appellant a salary of $250 per month from the date of the contract, and that appellant should operate all of the property under the supervision of respondent. There was also a provision that respondent might cancel the contract at any time. On October 17th the parties met at the office of J. N. Turner in San Francisco and executed an instrument in writing, providing that "the party of the first part (T. A. Piper) hereby gives to J. M. Kellerman an option to purchase all his right, title and interest in and to all said first party's interest in that contract entered into by and between the Suburban Oil Company, a corporation, party of the first part, and J. M. Kellerman, party of the second part, on the 19th day of April, 1912, wherein said Suburban Oil Company gave said J. M. Kellerman, a contract of lease on the following leased lands together with personal property thereon. . . . Said party also gives said second party an option to purchase all of said

second (first?) party's right, title and interest in that lease executed by the T. A. P. Oil Company . . . to J. M. Kellerman of April 20th, 1912, wherein said T. A. P. Oil Company leased to said J. M. Kellerman those certain leased lands, together with all machinery and personal property thereon situate near Los Gatos. . . .

"It is understood and agreed by and between the parties hereto that in the event that the said Kellerman discovers oil in paying quantities in any well on any part of the property known as the T. A. P. Oil Company's property, he will pay to said T. A. Piper the sum of One Thousand dollars immediately upon the well becoming a commercial well.

"It is understood and agreed by and between the parties hereto that in the event that the said Kellerman discovers oil in paying quantities in any well on any part of the property known as the Suburban Oil Company's property, he will pay said T. A. Piper the sum of One thousand dollars immediately upon the well becoming a commercial well.

"It is understood and agreed that in the event that said Kellerman fails to exercise this option and does not make the payments in accordance with the terms of this agreement hereinabove mentioned at the time said well or wells are brought in, that is to say, should he make the payment as provided for when a well is brought in on the T. A. P. Company's property and fail to pay the thousand dollars as provided for when a well is brought in on the Surburban Company's property, or *vice versa,* then the option shall be null and void as to the property that he has brought in a well on and fails to pay said first party the one thousand dollars 'as herein provided."

In the foregoing we have set out all of said agreement except the formal part and the specific description of the property covered by said leases and said contract. At the same time that this option was given, a lease was executed by J. N. Turner to J. M. Kellerman, covering nearly all the property still standing in the name of Turner and owned by appellant prior to April 22, 1912. This lease, however, was canceled by mutual consent on June 23, 1913, and seems to be of no importance here.

As to the transaction of said date, the court found: "That on the seventeenth day of October, 1912, the plaintiff and defendant entered into new arrangements under and by the

terms and conditions of which the property described in the leases standing in the name of J. N. Turner were leased to , the defendant on different terms and conditions than those provided for in contract of April 22, 1912, and as part of said arrangements, the said plaintiff and defendant entered into an agreement in writing which was duly made, executed and delivered and based upon good and sufficient considerations, moving from defendant to plaintiff, under the terms of which the said plaintiff gave to said defendant an option to purchase any and all right, title and interest, which plaintiff had or possessed in or to the said T. A. P. Oil Company lease, for the sum of one thousand dollars, after a commercial well should be produced on any of the properties mentioned in said lease. That no commercial well has as yet been produced or developed on any of the said properties mentioned in said lease of the T. A. P. Oil Company to defendant. That said agreement and option is still in full force and effect. That on said October 17, 1912, and as a part of said new arrangements, the said agreement of April 22, 1912, was by mutual consent between the plaintiff and the defendant, and upon good and sufficient consideration, moving from the defendant to the plaintiff, terminated and ended, and the parties thereto released from all of the terms and conditions thereof, and that said agreement of April 22, 1912, has never been revived, and ever since October 17, 1912, said agreement of April 22, 1912, has been and is now entirely terminated, canceled, annulled and ended.''

Of course, it is manifest that no language is used in the option of October 17th which expressly cancels the contract of April 22d. Upon the basis of respondent's contention, it is somewhat singular ''that an attorney drawing a document *for the purpose* of terminating existing business arrangements and substituting wholly different matters therefor, should neglect entirely to say a single word upon the subject of canceling the former contract.'' And, as further suggested by appellant, there is 'nothing in the option which refers in any way to the contract of April 22d. This, if unexplained, is a remarkable circumstance if it was the intention that the former contract should be ''terminated, canceled, annulled and ended.'' It is also plain that there is no inconsistency between said contract and the option which would prevent them from both existing at the same time. Another

circumstance of some importance is that the option does not deal with all the subjects embraced in the contract of April 22d. But probably a stronger reason than any other for contending that said option of October 17th cannot operate as a cancellation and extinguishment of the contract of April 22d is found in the following recital by appellant: Before the contract of April 22d was executed, Piper had no interest in any of the leases held by the T. A. P. and Suburban companies, and "it was only by that contract that he ever acquired any interest in such property. *If that contract which gave him his interest was canceled, then he had nothing upon which to give Kellerman an option to purchase."* This result would seem to reduce the option to mere waste paper. The effect of a total annulment of the former contract would be, naturally, to restore the parties to their condition prior to the execution of said agreement.

It is, at least, clear that we can find in the terms of the option itself no evidence of a purpose to substitute the new obligation for the old "with intent to extinguish the old obligation." (Civ. Code, sec. 1531, subd. 1.)

But parol evidence of such purpose was received by the court over the objection of appellant, and that involves a very important question in the case.

Respondent testified as to a conversation with appellant in which it was agreed that they would enter into another agreement, and "that was what brought up the argument about making a contract, and we discussed that at times before I went to Mr. Wretman the first time. We sat on a pile of casing at the Suburban well, and I said: 'Mr. Piper, I have expended much more money than we figured on, and I am ready now to enter into that other agreement.' 'Well,' he says, 'all right.' . . . On Tuesday I went to Mr. Turner's office and we threshed over several propositions and Wednesday we did the same. Thursday morning I made this proposition to them, that we would change the Turner lease, which was a contract between Turner and I, belongs to Piper and I—they signed many of these leases later on—'Now, boys, wouldn't it be a better proposition if we changed the sublease of this property for a one-sixth royalty—and we were paying a one-tenth to the land owners as Piper's lease called for, and they thought it over, and then we went into the whole matter and I had explained the whole thing the way I

framed it in mind, that we would cancel the old contract of April—that is what I meant about in my mind at night. I made this memorandum of what I would like to do. . . . Well, they agreed to it, the Turner lease was made, and the option to me was drawn and executed. . . . Mr. Piper and I had agreed that we would sublease for a one-sixth royalty. . . . And then we agreed that Mr. Turner would make a straight lease to me for $3\frac{1}{2}$ and that Mr. Piper—it would give it to Mr. Turner, but it was realy Piper's—that would make him $3\frac{1}{3}$; we agreed in lieu of the two and two-thirds that we would just cancel the whole thing, the salary and all, and I would agree to give him a thousand dollars if I got a commercial well on either property, and then that ended it. . . . I mean to give the impression that it was understood at that time that the old contract was canceled; Mr. Turner used words something to the effect that the old contract might be of some use in the event that I failed to pay the one thousand dollars within a certain time after oil had been found in commercial quantities. . . . From the time Piper went to work, I paid him $250 a month until he quit; I paid him just any place I happened to meet him, except the last check that I gave him on the 17th of October, 1912, in San Francisco, in his office, that is the time we made this contract. . . . I made the remark to Piper when we had decided on everything, making this objection that his salary quit then and there and I says to Mr. Piper, I said, 'You have so many days coming,' which made it five days less than a month, and I said, 'Tom, I have a check made out here for $250 so we will just let it go at a month up to the 27th'; he took the check; that was the last payment I ever made."

The question as to novation is one of intention, and the general rule is that any competent testimony tending to show the understanding of the parties is admissible. (29 Cyc. 1139.) But was parol evidence competent in this particular case?

In support of the negative, appellant quotes section 1856 of the Code of Civil Procedure providing when an agreement reduced to writing is "deemed the whole," and it is claimed that the section applies to the present instance since "no mistake or imperfection of the option was put in issue and the validity of the instrument is not in dispute nor is there any extrinsic ambiguity to explain nor any fraud alleged." Fur-

thermore, quotation is made of section 1860 of said code as authority for the declaration that the judge is to *interpret the language of the parties,* and that evidence of the surrounding circumstances is admissible *only* for the purpose of *construction* of its provisions, and it is contended that this section "does not permit evidence to be given (particularly in the absence of pleadings on the subject) of other conditions and further terms and additional understandings, about which the written contract is wholly silent." In this connection it is insisted that the rule is properly stated in 17 Cyc. 669 as follows: "The conversations and statements of the parties at the time of or just previous to the execution of the contract between them may be admissible for the purpose of aiding in the construction of the writing; but oral *declarations* of the parties made at or before the time of the execution of the instrument *are not admissible for the purpose of showing an intention or purpose not therein expressed."*

The last above statement of the rule is rather too sweeping as will be discovered by an examination of the cases cited in support of the text. Indeed, there are many instances wherein oral declarations are admissible for the purpose of showing an *intention or purpose* not expressed in the written instrument. They are collected in the article on evidence from which said quotation is made. Each instrument must be viewed, of course, in the light of its own peculiar circumstances, and the well-recognized exceptions to the general rule must not be ignored. The *terms* of an agreement when reduced to writing are deemed to have been completely set forth therein, but it is submitted that this rule of the code would not necessarily preclude such parol evidence as was admitted herein. In other words, such evidence may sometimes be received without affecting the *terms* of the written instrument. If the instrument were shown to express the complete purpose or intention of the parties in reference to the subject matter, then, the inquiry would be at an end. But where the written instrument is not complete, it has been held, as stated in 17 Cyc. 672, that "in order to correctly ascertain the intention of the parties to a deed, contract or other instrument of writing and properly interpret the same, it is competent to inquire into the purpose for which the writing was executed, and to this end parol evidence is admissible." It may be proved, of course, by parol

that payment of another obligation was intended by the execution of a note or other written instrument, and in a proper case it may be likewise shown that the execution of a written instrument, and the creation thereby of different rights and liabilities, was intended to constitute a novation and to effect a total extinction of privileges and obligations growing out of a prior written instrument. In many cases such evidence would not vary nor affect the *terms* of the later instrument. The qualification of the rule, however, in point here is that "in order to let in evidence of a collateral agreement between the parties, such agreement *must* be consistent with the terms of the writing; and the evidence must not tend to vary or contradict the terms of the written instrument or to defeat its operation." (17 Cyc. 714.)

It seems manifest that the case before us is brought clearly within said qualification. The parol agreement contended for, if rendered effectual, would surely defeat the operation of said option.

If the contract of April 22d was completely extinguished, it is difficult to understand how there remained in appellant any interest in and to the property, the option to purchase which was extended to respondent. Appellant having no interest left to convey, respondent certainly could not enforce specific performance of the former's covenant. And appellant having surrendered all interest in the property would be in no position to recover the amount of money promised by respondent, since the consideration therefor had failed. Again, by the agreement of April 22d, as we have seen, appellant acquired an interest in certain real property belonging to respondent, and the agreement of October 17th could not operate as a complete cancellation of that instrument for the reason that it does not convey or purport to convey any of said interest from Piper to Kellerman. The later instrument, therefore, by its terms, presents conclusive evidence that it was not intended as a complete extinguishment of the contract of April 22d, and we think that the parol evidence was not admissible. If there had been an attempt to show that it was intended simply to modify the earlier agreement, to discontinue the salary, or to make other modification not inconsistent with the provisions of the later contract, a different question might be presented.

But whether the foregoing be sound or not, there is another view which we think necessitates the conclusion that said finding is not sufficiently supported. From the whole record it appears that appellant did not agree that said contract of October 17th should annul the former one. Such is a fair inference from the testimony of respondent himself. He does, indeed, speak in general terms as though it were the understanding that the one should be substituted for the other, but it is apparent that he was testifying rather to a conclusion than of a probative fact that would show that such was the understanding and agreement of appellant. He does not relate any statement made by Piper, he does not recite any definite proposition that was submitted by either to the other and acquiesced in that would justify the conclusion that their minds met in the understanding and purpose that the first agreement should be annulled. The nearest approach to any satisfactory showing that such was their intention was his statement: ''We agreed in lieu of the two and two-thirds that we would just cancel the whole thing, the salary and all, and I would agree to give him a thousand dollars if I got a commercial well on either property and then that ended it.'' But therein he does not state what was said, but he *concludes* that there was such an agreement. Other statements made by him, however, rebut his inference as to appellant's agreement to the cancellation. For instance, he testified: ''Well, it looked as though that he (Piper) did not understand about us canceling the contract of April 22d.'' Furthermore: ''In the conversation with Mr. Turner, in the presence of Piper, I asked him to destroy the old contract, that I did not see as he had any use for it and he made the remark that 'No, that the thousand dollars might not be paid, and Mr. Piper would have nothing to fall back on,' therefore he thought we better keep the old contracts.''

The correspondence also between appellant and respondent is persuasive to the effect that Piper had no intention of canceling the earlier contract. Of course, there could not be any novation unless both parties agreed to it.

As to the counterclaim upon which respondent prevailed in the court below, a charge of fraud is made by appellant. It is claimed that a misrepresentation was made by Wretman as to the payment of a certain note for six hundred dollars of which Piper was one of the makers. The counterclaim

is based upon an account stated which was dated April 26, 1912. In the stated account was the following paragraph; "In connection with the third proposition I hold your note for $728 dated September 15th, 1911, interest 7 per cent payable quarterly and secured by 7,300 shares of Suburban Oil Company stock." This note was based upon a note for six hundred dollars dated January 9, 1909, signed by appellant, Morrison, and Arbuckle to N. E. Wretman, which was indorsed on September 16, 1911: "Paid in full by T. A. Piper, and he is entitled to reimbursement from his comakers. N. E. Wretman."

At the time this note was thus taken up, Mr. Piper gave the other note for $728 and pledged the said seven thousand three hundred shares of stock for its payment. Respondent calls attention to the fact that shortly after this note was given, Mr. Piper had an interview with Mr. Morrison wherein he is told of a supposed settlement by Mr. Morrison and Mr. Arbuckle with Mr. Wretman of the six hundred dollar note, and on November 13th Mr. Piper wrote a letter to Mr. Wretman in which he said: "I saw Mr. Morrison the other day and he is trying to find Mr. Arbuckle in regards to the note in which I settled with you for on the 16th of last Sept. for six hundred dollars, signed by myself, C. A. Morrison and F. W. Arbuckle. He stated to me that when he and Arbuckle made the settlement with you that this note was included and supposed to have been canceled." He then cautions Mr. Wretman not to sell the stock by reason of the nonpayment of interest and closes by saying: "I am sorry that I cannot see you before leaving, but will take it up immediately upon my return." Attention is then directed to the dates of these various transactions as follows: January 9, 1909, $600 note; September 16, 1911, $728 note; November 13, 1911, date of Piper's letter to Wretman; October 1, 1912, date of stated account. It can thus be seen that the stated account was consummated long after appellant was put upon inquiry as to the alleged settlement. He could hardly claim, therefore, that he should be protected in his own recklessness in relying upon respondent's representations that the note had not been paid. Moreover, Mr. Wretman testified: "I never had a settlement with Mr. Morrison and Mr. Arbuckle in regard to that note. I had a transaction with them in April or May, 1909, whereby if I could sell the property to a client of Mr.

Piper, Mr. Broder, that I would then surrender this note and pay them $300 apiece. This transaction was never closed and the stock never called for.'' We must accept Mr. Wretman's testimony as reliable, and according to his version of the affair, it amounted simply to an offer of sale which was for the benefit of all the parties. There seems to have been nothing to prevent Mr. Morrison or Mr. Arbuckle from withdrawing their stock or offer to sell when it was not called for or the consideration paid by Mr. Wretman. The offer of cancellation was conditional, and the conditions not having become actualities, the note, as we understand the situation, still remained a valid evidence of indebtedness.

One other feature should be noticed. In one of the defenses to the action it is alleged: ''That on or about the sixteenth day of November, 1912, this defendant, pursuant to the right and privilege given him in said agreement dated April 22, 1912, terminated, ended and canceled the same; and also on said November 16, 1912, released, dismissed and discharged the said plaintiff from his employ, and since October 17, 1912, the plaintiff has performed no work or service for or in behalf of this defendant.'' Said contract provided that: ''It is also understood and agreed by and between the parties hereto that the second party may cancel his contract at any time.'' It is also true that there is evidence ample to support said allegation that the contract was canceled on or about November 16th. However, the court made no finding upon this averment. If it had been found as alleged, the result would have been the same except that the judgment for defendant would be less by $250, the salary for one month.

As the record is presented, though, it hardly seems consonant with the orderly course of established procedure to direct a modification of the judgment, as that would be in effect for us to make a finding for the lower court.

The judgment and order are reversed.

Chipman, P. J., and Hart, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on January 15, 1917.